UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| OSCAR SMITH, JR., | ) |
|                 Plaintiff, | ) |
|     v. | ) Case No. 2:13-cv-0014-WTL-WGH |
| DR. LOLIT JOSEPH,[1] et al., | ) |
|                 Defendants. | ) |

**Entry Granting Motion for Summary Judgment
and Directing Entry of Final Judgment**

Plaintiff Oscar Smith, an inmate of the Wabash Valley Correctional Facility ("Wabash Valley") brings this action pursuant to 28 U.S.C. § 1983, alleging that the defendants, Dr. Lolit Joseph, Dr. Michael Mitcheff, and Marla Gadberry, were deliberately indifferent to his serious medical needs by denying him treatment for a Hepatitis C virus ("HCV") infection. The defendants move for summary judgment.

**I. Standard of Review**

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine issue of material

---

[1] The **clerk shall** update the docket to reflect that the correct name of defendant Dr. Joseph Lout is Dr. Lolit Joseph.

fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt,* 606 F.3d 355, 358 (7th Cir.2010). A party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in his or her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir.2010). If the nonmoving party fails to establish the existence of an essential element on which he or she bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson,* 457 F.3d 711, 716 (7th Cir.2006).

## II. Facts

Consistent with the foregoing, the following statement of facts was evaluated pursuant to the standards set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Smith as the non-moving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

### A. *Drs. Joseph and Mitcheff*

While incarcerated, Smith was diagnosed with an HCV infection. Smith has been enrolled in the Indiana Department of Corrections ("IDOC") Chronic Care Clinic ("CCC") for HCV patients during his incarceration. The CCC protocol calls for assessing HCV patients every 90 days and taking a blood draw to measure liver enzyme levels (amino alanine aminotransferase or "ALT levels"). On February 27, 2012 and May 14, 2012, Smith's ALT levels were 27. Then, on July 30, 2012, his ALT levels were 155. That day, Dr. Joseph ordered Smith's HCV genotype be determined. Because the various HCV genotypes respond differently to available drug

therapies, knowing the genotype of HCV a person is infected with is helpful in determining future treatment. On August 1, 2012, Dr. Joseph submitted a consultation request that Smith be evaluated for further treatment if Smith was genotype 2 or 3. Although patients with genotype 2 or 3 are not as common as genotype 1, the treatment course for genotypes 2 and 3 is shorter and generally more successful.

On August 2, 2012, Dr. Michael Mitcheff, the Regional Medical Director who reviews consultation requests, responded to Dr. Joseph's consultation request by inquiring if the genotype of Smith's HCV infection was known, if Smith's liver enzymes had been persistently elevated, if Smith had major mental illness or other medical problems, and if Smith was compliant with treatment. Lab results reflected that Smith was genotype 1A.

Smith submitted a grievance on October 17, 2012, relating to the treatment of his HCV infection. In responding to the grievance, Dr. Joseph stated that, pursuant to IDOC guidelines, an offender must have an Earliest Possible Release Date ("EPRD") greater than three years to begin the HCV drug therapy regimen. Dr. Joseph noted in the Grievance Response that Smith was too close to his release date to begin HCV treatment. Patients with HCV infections who will be leaving prison in less than three years will generally not be candidates for HCV drug therapy during confinement pursuant to IDOC guidelines. The reason for this is that the potential for interrupted antiviral therapy places the inmate at risk for a number of undesirable outcomes including treatment failure if the course of treatment is not completed, and adverse effects from medication if the inmate does not receive the required laboratory and clinical monitoring upon release or transfer. The potential for interruption of antiviral therapy for HCV also places an inmate at risk for the development of resistance virus.

Smith appealed the denial of his grievance. On December 4, 2012, Smith's appeal was

denied in a Level II Response. The Level II Response by Rose Vaisvilas, Director, Health Services stated: "Offenders who are within three years of the EPRD may be considered for medication if they meet certain criteria. However, Mr. Smith does not currently meet criteria for medication because he has not cooperated with health services staff attempting to obtain his chronic care labs….Mr. Smith refused his chronic care labs on 08/29/12 and again on 11/21/12. The provider cannot determine if Mr. Smith's ALT [liver enzyme level] has been elevated since he has refused to have his blood drawn. Offenders who are noncompliant with any provider's orders including laboratory tests are not eligible for medication." Dr. Joseph agreed with the reasons, in addition to the release date, stated by Ms. Vaisvilas for Smith being ineligible for the HCV drug treatment, as there are a variety of factors that affect an inmates' eligibility for HCV drug therapy including mental health status, refusal of treatment and degree of any liver damage.

On December 10, 2012, Dr. Joseph submitted a consultation at Smith's request to have his HCV treatment options evaluated. She noted Smith's liver enzyme results, his HCV genotype of 1A, and his release date of November of 2015. At that time, Dr. Joseph explained to Smith that he would not be recommended for HCV treatment as he was less than three years from his release date. Even with the limitations on treatment based on Smith's release date, until Smith was evaluated by a mental health professional, no further testing to determine if Smith is a proper candidate for the HCV drug therapy was recommended.

Dr. Joseph saw Smith again on December 21, 2012, for a chronic care clinic visit. At that time, his lab results and liver enzymes from a December 12, 2012 blood draw were noted. Dr. Joseph provided Smith with education on his HCV infection and Smith voiced understanding. On December 21, 2012, at Smith's request, Dr. Joseph submitted two more consultation requests to have Smith's HCV viral load evaluated and to have his HCV treatment options evaluated.

Again, Dr. Joseph noted Smith's release date was November of 2015 and that she had attempted to explain to Smith that he was not eligible for HCV treatment as he was less than three years from his release date. Further, even if his release date were not considered as a factor for further assessment for HCV drug therapy, Smith would need to be evaluated by a mental health professional before any HCV drug treatment was recommended.

On December 27, 2012, Dr. Mitcheff responded to Dr. Joseph's consultation request by inquiring if Smith was in segregation. The reason Dr. Mitcheff inquired about Smith's segregation status is that an inmate in behavioral segregation is not considered an appropriate candidate for HCV drug therapy. Because Smith was in segregation, the consultation requesting further evaluation for HCV treatment was not recommended.

On February 6, 2013, Smith refused the chronic care clinic liver function and blood draw tests that are necessary to determine his liver function. On March 13, 2013, the chart update prepared by Teresa Lennings reflects that Smith again refused labs including the liver enzyme tests used to monitor liver function.

On March 15, 2013, Smith was scheduled for an evaluation by a mental health provider related to his segregation placement and for evaluation of HCV treatment. The reason an inmate's mental health must be evaluated before beginning HCV drug therapy is that the treatment can cause or exacerbate depression, and causes mood changes in virtually all patients. Therefore, inmates who have a history of major depression or other psychiatric illnesses should be screened by a licensed mental health professional. Patients with a history of mental illness should be assessed by a mental health professional for their ability to comply with the frequent clinical and laboratory monitoring that is required for the safe administration of the HCV drug therapy. A further reason for mental health screening before recommending HCV drug therapy is

that severe side effects are common with HCV treatment. In addition to the depression and mood changes noted above, fatigue, muscle aches, headaches, nausea, skin irritation and rash, low-grade fever, weight loss, and anemia are common side effects. These major side effects result in many patients discontinuing the drug therapy to the detriment of their health. Thus, it is essential to properly evaluate a patient before starting the therapy.

Smith was seen in an onsite Consult by Dr. Mary Ruth Sims. Dr. Sims reported that Smith stated he was "mentally retarded and having problems. He did not specify what his problems were specifying only his bipolar diagnosis. [The] clinician showed him [the] report from psychological testing that resulted in resolving both diagnoses. He refused the clinician's request to articulate what problems he is having now and became angry and left the area, refusing the evaluation process." On March 15, 2013, Dr. Joseph entered a provider update noting that Smith refused psychological evaluation for HCV treatment. Smith says that he did not know what the evaluation was for, that he just got up and walked away and asked to see the psychiatrist.

Smith continues to be evaluated and monitored for his HCV infection. Drug therapy treatment for HCV is not recommended where: 1) the inmate has an unstable medical or mental health condition which precludes HCV treatment; 2) an inmate has been assessed and found to have contraindications to interferon treatment (one of the drugs used in the HCV antiviral drug treatment therapy); or 3) the inmate refuses treatment. If any one of the above criteria is present, HCV treatment should not be pursued and no further HCV testing is indicated, including HCV RNA testing, HCV genotyping, or liver biopsy. However, the inmate will continue to be monitored and assessed. Even where an inmate has been screened for mental illness and other contraindications to receiving HCV drug therapy, a variety of liver tests are required prior to

being recommended for drug therapy treatment. The HCV drug therapy regimen is long-term, expensive and only effective if the patient is carefully managed for constant daily adherence to the prescribed drug protocol.

    B. *Marla Gadberry*

As the Health Services Administrator ("HSA") at Wabash Valley, Marla Gadberry does not provide medical care to inmates. She has never provided medical care to Smith and did not deny medical treatment or disregard any serious medical need related to Smith's condition. In her role as HSA she is responsible only for non-clinical matters related to the Health Services Department such as scheduling, personnel supervision, and records supervision.

### III. Discussion

    A. *Drs. Joseph and Mitcheff*

Smith's claim is that the defendants were deliberately indifferent to his serious medical needs. Defendant doctors Joseph and Mitcheff move for summary judgment arguing that they were not deliberately indifferent. A deliberate indifference claim has two elements, one objective and one subjective. *McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013). To satisfy the objective element in the medical care context, Smith must "present evidence supporting the conclusion that he had an objectively serious medical need." *Id.* (internal quotation omitted). "'A medical need is considered sufficiently serious if the inmate's condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir.2012) (*quoting Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)). The medical defendants do not dispute that Smith's ailment qualifies as a serious medical need for the purposes of their motion for summary judgment.

As for the subjective element, Smith must show that the medical defendants were aware

of his serious medical need and were deliberately indifferent to it. *McGee*, 721 F.3d at 480. To demonstrate that a defendant acted with a "sufficiently culpable state of mind," a plaintiff must put forth evidence to establish that the defendant knew of a serious risk to the prisoner's health and consciously disregarded that risk. *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006). This subjective standard requires more than negligence and it approaches intentional wrongdoing. *See Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). For a medical professional to be held liable under the deliberate indifference standard, he must make a decision that is "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (*quoting Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)). The question is whether the denial of medical treatment is "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition," giving rise to a claim of deliberate indifference *Snipes v. DeTella,* 95 F.3d 586, 592 (7th. Cir. 1996); *see also Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (holding that deliberate indifference "is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed").

The defendants first argue that Smith has properly been denied treatment because he is within three years of his expected release date. But it is well-established that such a policy violates the Eighth Amendment. *See Roe v. Elyea*, 631 F.3d 843, 859 (7th Cir. 2011). The Seventh Circuit has explained that "[t]he failure to consider an individual inmate's condition in making treatment decisions is, as we already have concluded, precisely the kind of conduct that constitutes a 'substantial departure from accepted professional judgment, practice, or standards,

[such] as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" *Id.* at 862-63; (*quoting Sain,* 512 F.3d at 895 (internal quotation marks omitted)).

The defendants also argue that the fact that Smith is in long-term behavioral segregation is a contraindication for HCV treatment. But there is no indication of professional judgment behind such a conclusion and this reason therefore is not sufficient to show that the defendants were not deliberately indifferent to Smith's medical needs. *See Arnett v. Webster,* 658 F.3d 742, 754 (7th Cir. 2011) (finding that substituting pain medication for the inmate's prescribed anti-inflammatory medication that wasn't on the Bureau of Prisons' approved list may constitute deliberate indifference if the medical professional chose 'an easier and less efficacious treatment without exercising professional judgment.'").

The defendants further argue that Mr. Smith is not a proper candidate for treatment because on two occasions he has refused to cooperate with staff attempting to obtain his chronic care labs and he refused the mental health evaluation necessary to determine eligibility for HCV treatment. The defendants argue that Smith's refusals make it impossible to determine whether his ALT levels have been elevated and that prisoners who are noncompliant with laboratory orders are not eligible for medication. Smith counters that he did not refuse labs as often as the defendants claim. While this general denial is not sufficient to create a genuine issue of material fact, it is undisputed that Smith did have labs drawn to determine his ALT levels several times in 2012. Those labs indicated that his ALT level was 27 in May, 155 in July, and 217 in December of 2012. From these facts, it is evident that Smith's ALT levels have been elevated.

Smith's refusals of certain assessments, however, are more troubling because it is undisputed that the HCV treatment regimen is long-term and only effective if the patient is carefully managed for daily adherence to the drug protocol. Further, Smith refused to undergo a

psychological examination. As the defendants have explained, such an examination is necessary to ensure the patient is able to comply with frequent clinical monitoring and because HCV treatment can cause or exacerbate depression. Smith's distrust of the person sent to perform the psychological evaluation does not relieve him of the requirement to be evaluated. *See Arnett*, 658 F.3d at 754 ("Although an inmate is not entitled to demand specific care and is not entitled to the best care possible, he is entitled to reasonable measures to meet a substantial risk of serious harm.").

Here, the defendants have provided a number of reasons for withholding treatment for Smith's HCV infection. Some of these reasons – that Smith is less than three years from his expected release date and that Smith is confined in behavioral segregation – do not pass constitutional muster. However, the defendants have provided other reasons – that Smith has on occasion refused chronic care labs and that Smith refused the necessary mental health evaluation – that do support the conclusion that their treatment decisions were based on professional judgment. The Court cannot conclude under these particular circumstances that their decisions represented "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson*, 541 F.3d at 697. Accordingly, defendants Dr. Joseph and Dr. Mitcheff are entitled to summary judgment on Smith's claims of deliberate indifference.

B. *Marla Gadberry*

Defendant Marla Gadberry moves for summary judgment arguing that she was not personally responsible for any of the decisions involving Smith's medical care. "[T]o recover damages under ' 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right." *Johnson v. Snyder,* 444 F.3d 579, 583 (7th Cir. 2006)

(*quoting Gentry v. Duckworth,* 65 F.3d 555, 561 (7th Cir. 1995)). "Section 1983 creates a cause of action based upon personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Sheif-Abdi v. McClellan*, 37 F.3d 1240, 1248 (7th Cir. 1994), *cert. denied*, 513 U.S. 1128 (1995).

It is undisputed that Gadberry has never provided medical care to Smith and did not deny medical treatment or disregard any serious medical need related to Smith's condition. In her role as HSA, she is responsible only for non-clinical matters related to the Health Services Department such as scheduling, personnel supervision and records supervision. Accordingly, Gadberry is entitled to summary judgment on Smith's claims against her.

### IV. Conclusion

The defendants' motion for summary judgment [dkt 17] is **granted**. Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 02/28/2014

Distribution:

Oscar Smith, Jr.
861084
Wabash Valley Correctional Facility
Electronic Service Participant – Court Only

All electronically registered counsel

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana